UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE CANTU,<br><br>　　　　　　　　Plaintiff,<br><br>　　v.<br><br>TAPESTRY, INC.,<br><br>　　　　　　　　Defendant. | Case No. 22-cv-1974-BAS-DDL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS**<br><br>**(ECF No. 10)** |

　　　　Plaintiff Jesse Cantu ("Plaintiff") is a self-described consumer and data privacy advocate who commenced this class-action suit on December 13, 2022, against Defendant Tapestry Inc. ("Defendant"), which does business as Coach.com ("Coach"). Plaintiff claims that Defendant's actions—disclosing, without consent, the identities of customers and the titles of videos they view on Coach's website to Facebook—violate the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

　　　　Now before the Court is Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("FAC"). (Mot., ECF No. 10.) Defendant argues that Plaintiff's Complaint must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(1). In the alternative, Defendant argues that Plaintiff has failed

to state a claim upon which relief can be granted. Plaintiff opposes (Opp'n, ECF No. 13) and Defendant replies (Reply, ECF No. 14).[1]

The Court finds the resolution of Defendant's Rule 12(b)(1) and Rule 12(b)(6) motion is suitable without the need for oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L. R. 7.1 (d)(1). For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss.

## I.   BACKGROUND

In 1988, the *Washington City Paper* published a list of then-Supreme Court nominee Robert Bork's video rental history after a D.C.-area store provided the information to a reporter. In response to the disclosure, Congress passed the VPPA, recognizing that such an invasion of privacy, especially in an era of rapidly developing technology, is "an issue that goes to the deepest yearnings of all Americans." S. Rep. No. 100–599, at *6 (1988). The VPPA prohibits any "video tape service provider" from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The Act provides for liquidated damages in the amount of $2,500, as well as punitive damages and other equitable relief for violations of its provisions. *Id.* § 2710(2)(A)–(D).

In the instant case, Plaintiff alleges that Defendant leverages an elaborate system of cookies and other data capturing processes to better tailor its marketing and advertising campaigns to its customers. (FAC ¶¶ 9, 53.) To do this, Defendant enlists a Facebook-curated software, known as the Facebook Tracking Pixel ("Facebook Pixel"). (FAC ¶ 10.) The Facebook Pixel is a string of programming code that advertisers integrate into their websites. (*See id.*) Once installed, the Facebook Pixel allows Defendant to collect information about how users interact with its site. (FAC ¶¶ 11, 13.)

---

[1] Defendant also filed a "Notice of Recent Authority" (ECF No. 15), which drew a corresponding response from Plaintiff (ECF No. 16). The Court will disregard both the Notice of Recent Authority and Plaintiff's response, as Defendant failed to seek leave of court to file such a notice, pursuant to section 4F of this Court's Standing Order for Civil Cases.

Most notably, Plaintiff alleges that when a user visits Coach.com, Defendant has programmed the Facebook Pixel to record the Website's URL and the title of any video watched on the website. (FAC ¶¶ 19–21.) Facebook Pixel then sends such information to Facebook. (*Id.*) It also links a user's video viewing information to a specific Facebook ID, should that user have a Facebook account. (FAC ¶ 56.)

Facebook Pixel does so using three different cookies. (FAC ¶¶ 23–28.) When a visitor watches a video on Coach.com while logged into Facebook, the Facebook Pixel compels a visitor's browser to transmit a "c_user cookie," which contains a visitor's unencrypted Facebook ID. (FAC ¶ 23.) A Facebook ID is a lengthy string of numbers, which by itself, contains no personally identifiable information. (FAC Fig. 6.) But Plaintiff alleges that anyone can connect a Facebook ID to one's Facebook profile, simply by appending the string of numbers to the end of Facebook.com. (FAC ¶ 29.) This leads one to the Facebook account associated with the Facebook ID. (*Id.*) When a visitor's browser has recently logged out of Facebook, a smaller set of cookies is sent through the Facebook Pixel. (FAC ¶ 24.) The "fr cookie" contains an encrypted Facebook ID and browser identifier. (FAC ¶ 25.) Another cookie, called the "datr cookie," supplies browser information, and the "_fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser." (FAC ¶¶ 26–27.) Plaintiff does not explain how the encryption status of a Facebook ID affects one's ability to identify a particular Facebook user. And he does not allege whether, by themselves, these smaller sets of cookies disclose information sufficient to identify a specific Facebook profile. However, he claims that "alongside event data for videos," the "fr cookie" and "_fbp cookie" allow Facebook to identify a particular Facebook user. (FAC ¶¶ 25–26.) Facebook then "matches activity on Coach.com with a user's profile." (FAC ¶ 34.)

To recap, Plaintiff claims that the code employed by Defendant generally can record and disclose the titles of videos watched on Coach.com. Cookies, which contain the Facebook IDs of those users watching such videos, are transmitted to Facebook, perhaps regardless of whether a user is actively logged into Facebook. And Facebook IDs are easily

linked to corresponding Facebook users, as anyone can append the numerical ID to the end of Facebook.com.  Together, this information—Facebook IDs and the viewing history of customers—constitutes what Plaintiff alleges is "personally identifiable information" ("PII") protected by the VPPA.  *See* 18 U.S.C. § 2710(a)(3).  The PII is disclosed to Facebook to "build audiences" and "retarget . . . Facebook's advertising campaigns." (FAC ¶ 58.)  And this is all done without consent. (FAC ¶ 59.)

Plaintiff claims that during the "Class Period," Defendant's website hosted and delivered video content, such as the "Dream It Real" video.  (FAC ¶ 15.)  Plaintiff watched this video around October 31, 2022.  (*Id.*)  When he did so, Defendant disclosed to Facebook Plaintiff's PII, like his Facebook ID and the title of the video he viewed, through the process just described above.  Plaintiff brings suit on behalf of himself and a class of other users similarly situated who have watched videos on Coach.com.  (FAC ¶¶ 46–51.)  He seeks statutory and punitive damages, along with injunctive relief.  (FAC at 16:2–14.)

## II.     LEGAL STANDARDS

### A.     Standing

Under Rule 12(b)(1), a party may move to dismiss a claim for lack of subject matter jurisdiction, including the absence of standing.  *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1123 (9th Cir. 2010).  Article III, Section 2, of the Constitution limits federal courts to hearing "actual cases or controversies."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016).  This means that a plaintiff must have standing to bring suit in federal court.  *Id.* at 338.  A plaintiff must show three distinct elements to satisfy the irreducible constitutional minimum for standing.  He must demonstrate (1) an injury-in-fact via "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) causation—the injury must be "fairly . . . trace[able] to the challenged action of the defendant"; and (3) redressability— meaning that it must be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citations and quotations omitted) (alteration in original).

When the issue of standing is challenged on a Rule 12(b)(1) motion to dismiss, "each element of standing 'must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (quoting *Lujan*, 504 U.S. at 561). That is, "[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party." *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

### B. Failure to State a Claim

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. Fed. R. Civ. P. 12(b)(6); *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court must accept the factual pleadings in the complaint as true. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). It must also construe the factual pleadings and the inferences drawn from such pleadings in the light most favorable to the nonmoving party. *Id.* However, a court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678. A plaintiff must do more in his complaint than allege a series of "labels and conclusions" to establish a plausible basis for a defendant's liability. *Twombly*, 550 U.S. at 555. Indeed, "a formulaic recitation of the elements of a cause of action will not do." *Id.* And when a plaintiff has failed to allege facts sufficient for a court to plausibly find a cause of action, it is not proper for the court to close that gap on behalf of the plaintiff and assume that "[he] can prove facts that [he] has not alleged . . . ." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

### III. ANALYSIS

Defendant first argues that Plaintiff has not plausibly alleged he has Article III standing, such that this Court must dismiss the Complaint for lack of subject matter jurisdiction. Defendant avers that (1) Plaintiff has not adequately pleaded an "injury-in-fact," because the "Dream It Real" video that he alleges to have watched is not a video and the disclosure is not of his own PII, and (2) Plaintiff cannot "fairly trace" his injury back to Coach because he has named the wrong defendant. (Mot. at 9–16.) In the alternative, Defendant argues that Plaintiff fails to state a claim under the VPPA because (1) it is not a "video tape service provider" within the meaning of the Act, (2) it did not "knowingly" disclose PII of its customers, (3) a Facebook ID is not PII, and (4) the disclosures are exempt from liability under the Act. (Mot. at 1, 3, 16–23.)

#### A.  Standing

Defendant argues that Plaintiff fails the first two prongs of the test articulated in *Lujan*. That is, he cannot show an injury-in-fact, nor can he properly trace his injury back to Defendant because he has named the wrong company in his suit. *See Lujan*, 504 U.S. at 560–61. The Court is unpersuaded by either contention.

##### 1.  Injury-in-Fact

An injury-in-fact is a harm that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations omitted). Under some consumer protection statutes, a claim that a particular provision has been violated is, by itself, not a "concrete and particularized" injury. *See, e.g.*, *Spokeo*, 578 U.S. at 341. That is, a plaintiff must plead an additional harm, like a financial or reputational harm, in addition to the bare statutory violation. *See id.* (holding that a plaintiff must allege more than a "bare procedural violation" of the Fair Credit Reporting Act that is "divorced from any concrete harm").

This does not hold true for causes of action under the VPPA. In the Ninth Circuit, the concreteness requirement for Article III standing is satisfied when a consumer alleges that his data has been impermissibly disclosed in violation of the Act. *Eichenberger v.*

*ESPN*, 876 F.3d 979, 983 (9th Cir. 2017).  Violations of the VPPA are not mere "procedural violations" as the Supreme Court described in *Spokeo*.  *Spokeo*, 578 U.S. at 342; *Eichenberger*, 876 F.3d at 982.  Rather, "every 18 U.S.C. § 2710(b)(1) violation 'present[s] the precise harm and infringe[s] the same privacy interests Congress sought to protect' by enacting the VPPA."  *Eichenberger*, 876 F.3d at 982 (citing *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) (alterations in original)).  Accordingly, it is sufficient for Plaintiff to plead facts that Defendant has disclosed his information in violation of the VPPA, and nothing more.  *Id.*; *see also Perry v. Cable News Network*, 854 F.3d 1336, 1341 (11th Cir. 2017) ("Accordingly, we hold that a plaintiff such as Perry has satisfied the concreteness requirement of Article III standing, where the plaintiff alleges a violation of the VPPA for a wrongful disclosure."); *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 274 (3rd Cir. 2016) ("While perhaps 'intangible,' the harm is also concrete in the sense that it involves a clear *de facto* injury, *i.e.*, the unlawful disclosure of legally protected information." (citing *Spokeo*, 578 U.S. at 340)).

Defendant does not disagree with the above proposition.  (*See* Reply at 2:15–20.)  Instead, it contends Plaintiff's Complaint is still deficient because he did not watch a video in the first place, so he does not satisfy the standard for alleging a "concrete" injury elucidated in *Eichenberger*.[2]  (*See* Mot. at 11:4–10, 14:7–9.)  First, Defendant claims that the screenshot attached to Plaintiff's Complaint shows he retrieved the "Dream It Real" video on an internet archive site, not Defendant's website.  (Mot at 10:3–9.)  More importantly, when one visits the web archive URL that appears in the image Plaintiff provided in his Complaint, Defendant argues that no video is displayed at all.  Only a still

---

[2] Defendant lumps all its standing arguments under the "fairly traceable" prong of the *Lujan* test. (Mot. at 9:20.)  But the Court finds that it is more accurate to separate and consider some of Defendant's arguments—namely that Plaintiff did not even watch a video in the first place, and that his PII was not disclosed—under the "injury-in-fact" element.  These arguments do not concern whether Defendant is the cause of the harms Plaintiff alleges; rather, they argue that Plaintiff suffered no harm at all.

image appears. (Mot at 11:4–10; RJN, Ex. C.)[3] Thus, if Plaintiff did not watch a video in the first place, there can be no concrete injury.

This argument is unavailing. At the pleading stage, Plaintiff is under no obligation to provide figures such as screenshots to bolster his pleading. *See* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain: . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). And to be sure, Plaintiff pleads that he watched the video around October 31, 2022. (FAC ¶ 15.) On a facial attack, the Court must accept his allegation as true.[4] *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).

Defendant nonetheless argues that where allegations of the complaint are contradicted by exhibits cited in the complaint or matters subject to judicial notice, the Court may disregard those allegations, particularly where they are conclusory and

---

[3] Defendant filed concurrently with its Motion to Dismiss a Request for this Court to take Judicial Notice of seven separate exhibits labelled A–G. Under Rule 201 of the Federal Rules of Evidence, a court may take notice of an adjudicative fact if it is "not subject to reasonable dispute" because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The Court **GRANTS** Defendant's Request for Judicial Notice as it pertains to Exhibits A and B, because they are records of incorporation maintained by a government agency that "are not subject to reasonable dispute," *see* Fed. R. Evid. 201(b), and are "of matters of public record," *see Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

The Court, however, **DENIES** Defendant's Request for Judicial Notice of Exhibits C–G because they are copies and screen captures of webpages, whose accuracy can "reasonably be questioned." *See* Fed. R. Evid. 201(b). Defendant claims that where websites "form the basis for Plaintiff's claims and are *referenced* throughout the FAC," judicial notice is appropriate. (RJN at 5:7–14 (emphasis added).) But here, Defendant confuses two doctrines. Indeed, the incorporation-by-reference doctrine "treats certain documents as though they are part of the complaint itself" "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 1022 (2018) (citing *United States v. Ritchie*, 342 F.3d 903, 907–09 (9th Cir. 2003)). But this is a separate doctrine from rule-based Judicial Notice. Applying the correct doctrine, Plaintiff's Complaint does not "necessarily depend" on the documents Defendant is attempting to incorporate now. But even assuming, *arguendo*, that Defendant can properly incorporate the remaining exhibits by reference, this does not affect the outcome of the Court's standing analysis, as further explained below.

[4] Defendant levels a facial attack on Plaintiff's Complaint, asserting the allegations in the Complaint itself are insufficient to invoke federal jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1036, 1039 (9th Cir. 2004); *see also* (Mot. at ii:11–14) ("Tapestry brings this motion as a 'facial' challenge to the [FAC] filed by Plaintiffs on the basis of the complaint and documents that are incorporated therein by reference and/or are the subject of Tapestry's requests for judicial notice.").

- 8 -

unsupported by specific facts. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 989 (9th Cir. 2001) (finding the attachment of an arbitration award to a complaint showing the plaintiff physically attacked his head coach "fatally undermine[d]" the claim that the discipline meted out by the NBA and the team in response was motivated by racial animus). A "plaintiff can plead . . . himself out of a claim by including unnecessary details contrary to his claims." *Id.* (citing *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998)). However, nothing in the screenshot "fatally undermines" what Plaintiff has pleaded here. Cantu's imperfect attempt at bolstering his pleading with the help of an internet archiving service does not seriously foreclose his allegation that he visited Coach.com and watched an actual video, not a still image, at some time before filing his Complaint.

Defendant next argues that Plaintiff cannot have suffered an injury-in-fact because his PII was not disclosed. It posits two distinct points. First, it avers that other screenshots provided in the Complaint show the data disclosure for a video titled "LiveStream," which Plaintiff never alleges to have watched. (FAC at Figs. 2, 4–8; Mot. at 12:7–8.) Second, Defendant claims Plaintiff's Complaint shows the disclosure of PII of a "tester" account, not the disclosure of his own information. (Mot. 13:25–14:3; RJN, Ex. F ("When one does exactly as Plaintiff alleges—appending the Facebook ID allegedly transmitted by the c_user cookie shown above . . . —it does not reveal Plaintiff's Facebook profile at all.").) Thus, Defendant argues Plaintiff never alleges his PII was disclosed, meaning he has no standing to sue. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 375 (1982) (holding that even a "tester" must show an injury to himself to successfully plead Article III standing); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011) (same).

For a similar reason as above, the Court is unpersuaded by Defendant's argument. Plaintiff pleads that he "visited the Website and watched one or more video." (FAC ¶ 41.) As a result, Defendant "also disclosed identifiers for Plaintiff . . . [and] disclosed Plaintiff's video viewing habits to a third party." (FAC ¶ 42.) The Court must accept this as true. And again, nothing about the screenshots provided by Plaintiff contradicts his factual

- 9 -

allegations such that they are fatal to his cause of action. *See Sprewell*, 266 F.3d at 989. On Defendant's facial challenge to standing, the Court takes as true that Plaintiff visited Coach.com at a certain date, and it also accepts as true that Coach discloses PII as it did with the tester account and its "LiveStream" video. Thus, it can be permissibly inferred that Plaintiff's data was similarly disclosed when he visited the website. Plaintiff has plausibly pleaded he watched the video and that his PII was disclosed. And that is enough, for now. *See Lujan*, 504 U.S. at 561.

### 2.     Fairly Traceable

To survive a motion to dismiss for lack of Article III standing, a plaintiff must also establish that his injury is "fairly traceable" to the actions of the named defendant. That is, "[p]laintiffs must show that the injury is causally linked . . . to the [defendant's] alleged misconduct, and not the result of misconduct of some third party not before the court." *Wash. Env't Couns. v. Bellon*, 732 F.3d 1131, 1141 (9th Cir. 2013).

Defendant's remaining challenge to Plaintiff's standing is simply that he has named the wrong defendant. Thus, his injury cannot be fairly traced back to Coach. Defendant argues that the website that allegedly hosted the "Dream It Real" video "is a webpage promoting the charity works of the Coach Foundation, not Defendant Tapestry, Inc." (Mot. 11:11–12:6.) Defendant then goes on to explain that Coach Foundation is a separately incorporated company and distinct legal entity from Tapestry, Inc., with the former embodying its own philanthropic mission divorced from the larger Coach brand. (RJN, Ex. A–B.) Thus, Defendant would like this Court to dismiss the Complaint because "the only reasonable inference from these facts is that the webpage and Dream It Real concern the Coach Foundation, which is not a party to this case." (Mot. at 12:1–2.)

What exactly Defendant means by arguing that "the webpage and Dream It Real *concern* the Coach Foundation" (and not Coach.com) is ambiguous. (*Id.* (emphasis added).) If "concern" means Tapestry does not own, or is not responsible for, the webpage and video content Plaintiff alleges to have watched, this argument fails. Plaintiff alleges he watched the videos on Coach.com. (FAC at 1:1–5.) That, by itself, is enough to

overcome the Rule 12(b)(1) motion. And even if one looks to the screenshot of the "Dream It Real" video that Plaintiff provides in his Complaint, one can see that the URL for this content is https://coach.com/coachfoundation. (FAC Fig. 1.) "Coach.com" precedes "Coach Foundation." Defendant is, of course, free to challenge the allegation after the pleadings stage, but the Court cannot make such a factual determination on a Rule 12(b)(1) motion that facially attacks the complaint. *See, e.g.*, *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at * 4 (S.D.N.Y. Nov. 17, 2022) (holding plaintiff's allegations that defendant disclosed his PII sufficient to overcome a motion to dismiss); *Belozerov v. Gannett Co.*, No. CV 22-10838-NMG, 2022 WL 17832185, at *4 (D. Mass. Dec. 20, 2022) (same); *Harris v. Pub. Broad. Serv.*, No. 1:22-CV-2456-MLB, 2023 WL 2583118, at *5 (N.D. Ga. Mar. 20, 2023) ("If discovery reveals Defendant played no role in the transmission of Plaintiff's information to Facebook, the Court will consider that at summary judgment.").

If "concern" instead means that the webpage and video—even if truly operated by Coach.com—serves to promote Coach Foundation's philanthropic mission such that Plaintiff's injury is not "fairly traceable" to the corporate objectives of the larger Coach enterprise, this argument also is unconvincing. The content of the webpage and video is irrelevant to the VPPA's non-disclosure requirement. The Court finds nothing in the statute that would require otherwise. *See Belozerov*, 2022 WL 17832185, at *3 (holding liability under the VPPA is not restricted to a video's precise content). Thus, Defendant cannot challenge Plaintiff's standing on this basis because a cognizable harm under the VPPA is not determined by the content of the pre-recorded video or any webpage it is hosted on.

As such, Defendant's Motion to Dismiss under Rule 12(b)(1) fails because the Court finds that Plaintiff has sufficiently pleaded a redressable harm under the VPPA that would

garner him Article III standing.[5] The Court, therefore, **DENIES** Defendant's Motion to the extent it seeks to dismiss Plaintiff's Complaint for lack of subject matter jurisdiction.

### B. Failure to State a Claim

Because the Court finds Defendant's standing arguments unpersuasive, the Court now turns to Defendant's second contention that Plaintiff has failed to state a claim upon which relief can be granted. To plead a plausible claim under Section 2710(b)(1), Plaintiff must allege that "(1) defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015). Defendant challenges all four elements. The Court finds that Plaintiff has failed to sufficiently plead facts that show Defendant is a "video tape service provider" within the meaning of the VPPA. As such, it grants Defendant's Motion to Dismiss without reaching the remaining elements.

The VPPA defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4). Defendant contends that its business as a luxury fashion retailer cannot fall within the meaning of a "video tape service provider" as contemplated by the VPPA.[6] The Ninth Circuit has yet to speak directly on what constitutes a "video tape service provider."

---

[5] Defendant also argues that Plaintiff lacks Article III standing because the information disclosed is not PII within the meaning of the VPPA, and he has not adequately alleged that he was a consumer as defined by the Act. The Court will not consider these arguments as part of Defendant's Rule 12(b)(1) motion because they attack the merits of Plaintiff's VPPA claim, not his standing to sue. *See Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) ("As a general rule, when '[t]he question of jurisdiction and the merits of [the] action are intertwined,' dismissal for lack of subject matter jurisdiction is improper." (quoting *Meyer*, 373 F.3d at 1039 (9th Cir. 2004) (alterations in original))).

[6] Plaintiff states "Defendant does not challenge the first element that it is a 'video tape service provider' under the VPPA." (Opp'n at 6:16–18.) That is wrong. (*See* Mot. at 1:18–23 ("Plaintiff Jesse Cantu . . . seeks to expand the Act well beyond where Congress could have ever imagined to encompass not only movies and the like, but essentially any moving images which appear on a website . . . .").)

And, it has not foreclosed the possibility of businesses outside of the traditional brick-and-mortar rental store from incurring liability under the Act. *See Eichenberger*, 876 F.3d at 979 (addressing other elements of plaintiff's VPPA claim, but not whether ESPN was properly a "video tape service provider"); *Mollett*, 795 F.3d at 1066 (seeming to accept Netflix as a "video tape service provider" without further discussion).

      This Court is also aware of the expansion of the VPPA over the past decade in other district courts to cover defendants even beyond video streaming services. Two important phrases in the statutory language have spurred such an expansion. The phrase "rental, sale, *or* delivery" indicates that Congress meant for the Act to cover more than just a physical video rental store like the one Judge Bork patronized. *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204 (C.D. Cal. 2017) (quoting 18 U.S.C. § 2710(a)(4)). "Indeed, lest the word 'delivery' be superfluous, a person need not be in the business of either renting or selling video content for the statute to apply." *Id.* at 1221. Furthermore, the phrase "prerecorded video cassette tapes *or similar audio visual materials*" indicates that the VPPA's protections extend beyond physical video tapes. 18 U.S.C. § 2710(a)(4) (emphasis added). As long as such content is pre-recorded, rather than live, the content need not be in any precise format to implicate the Act's protections. *See In re Vizio*, 238 F. Supp. 3d at 1221 (citing *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012)); *see also Louth v. NFL Enters.*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022) (declining to include live video broadcasts as "similar audio visual materials" under the VPPA).

      Yet to fall under the VPPA's obligations, a defendant must also be "engaged in the business . . . of" delivering video content. 18 U.S.C. § 2710(a)(4). The Court finds the analysis undertaken by the Central District of California, and implicitly approved of in the Northern District of California, to be on point. *In re Vizio*, 238 F. Supp. 3d at 1204; *In re Facebook, Inc., Consumer User Profile Priv. Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019). The language "engaged in the business" "connotes 'a particular field of endeavor,' *i.e.* a focus of the defendant's work." *In re Vizio*, 238 F. Supp. 3d at 1221 (citing Webster's

Third New International Dictionary 302 (1981) (def. 1d); The American Heritage Dictionary: Second College Edition 220 (1991) (defs. 1a, 1b); 2 Oxford English Dictionary 695 (1989) (def. 14b); Webster's New World Dictionary: Third College Edition 189 (1988) (def. 1).) For instance, a letter carrier who delivers a package containing a videotape obviously "delivers" such a product but in no way is "engaged in the business" of such delivery. *Id.* Thus, it is not enough for a business to be "peripherally or passively" engaged in the delivery of video content to come under the obligations imposed by the VPPA. *Id.* Instead, the defendant's business must be "significantly tailored to serve that purpose" of delivering video content. *Id.*

On its face, Plaintiff's Complaint falls short of this standard. Plaintiff alleges, in a conclusory fashion, that Defendant is "engaged in the business of 'rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials.'" (FAC ¶ 14 (emphasis omitted).) He then alleges, specifically, Defendant's "business model involves monetizing instances in which consumers watch videos." (*Id.*) But this is insufficient. Even if it is true that Defendant's business model monetizes the occasions its customers watch videos, Plaintiff has not alleged facts supporting an inference that Defendant or Coach's enterprise is "significantly tailored" to achieving such a purpose. The VPPA's standard is a higher bar, which Plaintiff's allegations fail to reach. If anything, the "monetization" of "instances" plausibly suggests Coach "passively" or "peripherally" engages in the delivery of video content, but this is not enough to garner liability under the VPPA. *See In re Vizio*, 238 F. Supp. 3d. at 1221.

Plaintiff, in his Opposition, cites a string of cases purporting to expand liability under the VPPA such that Defendant, by hosting video content on its retail website, would fall under the Act's sphere of regulation. But the cases cited stand for no such proposition. Take, for instance, *Cappello v. Walmart, Inc.*, which implicitly found Walmart.com to be a "video tape service provider." No. 18-CV-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019). (Opp'n 7: 15–17.) There, Walmart.com fell within the purview of the VPPA because it "sells a variety of consumer goods, including DVDs, Blu-Ray Discs,

video games, and other video media," and then allegedly disclosed those product IDs along with the purchasers' Facebook ID. It was not the case that Walmart.com happened to host a few instances of video content like Plaintiff has alleged here. *See Cappello*, 2019 WL 11687705, at *1. Walmart.com directly engaged in the sale and delivery of video content, and then disclosed the titles of videos purchased and the identities of its purchasers, just as was done with Judge Bork. It was thus more plausibly a "video tape service provider" within the meaning of the VPPA.

Next, Plaintiff invokes another set of decisions that extend VPPA liability to major entertainment platforms that digitally distribute video content. *See In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *4–6 (N.D. Cal. Aug. 10, 2012) (finding the streaming service Hulu to be a "video tape service provider"); *Louth*, 2022 WL 4130866, at *4 (finding the NFL mobile application to be a "video tape service provider" in so far as it produces pre-recorded content). (Opp'n at 6:25–27, 7:12–13, 7:20–22.)[7]

But when the Court compares these cases to the Complaint's limited allegations, it finds the above authorities unpersuasive for extending liability to Defendant. In *Louth*, the plaintiffs alleged that the NFL mobile application disseminated " . . . exciting videos and highlights, and replays of every game." 2022 WL 4130866, at *1. In *In re Hulu*, it was alleged that the popular streaming service's business revolved around "provid[ing] video content, both previously released and posted and originally developed." 2012 WL 3282960, at *2. Such "programs include news, entertainment, educational, and general interest programs." *Id.* There are no similar allegations in Plaintiff's Complaint that show Defendant's dissemination of video matches either the numerosity of pre-recorded videos disseminated by the NFL or the breadth of video material disseminated by a streaming service like Hulu. The allegations in *In re Hulu* and *Louth* support a claim that the respective products in each case are "significantly tailored" to delivering video content. *In re Vizio*, 238 F. Supp. 3d at 1221. Plaintiff's allegations, on the other hand, beg for more.

---

[7] And though not cited by Plaintiff, one would include the Ninth Circuit decisions involving ESPN and Netflix in this category of cases, too. *See Eichenberger*, 876 F.3d at 979; *Mollett*, 795 F.3d at 1045.

Lastly, Plaintiff cites a plethora of decisions that extend VPPA liability to news websites that procure pre-recorded video. *See Belozerov*, 2022 WL 17832185, at *3 (finding plaintiff plausibly pleaded *USA Today* is a "video tape service provider"); *Czarnionka*, 2022 WL 17069810, at *4 (holding plaintiff's allegation that *The Epoch Times*' webpage delivers a range of audiovisual content in the form of "news programs, television shows, documentaries, movies, and other audiovisual content" was sufficient); *Ambrose v. Boston Globe Media Partners LLC*, No. CV 21-10810-RGS, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (concluding plaintiff plausibly alleged *The Boston Globe* is a "video tape service provider"); *Lebakken v. WebMD, LLC*, No. 1:22-CV-644-TWT, 2022 WL 16716151, at *3 n.2 (N.D. Ga. Nov. 4, 2022) (holding plaintiff's allegations that WebMD delivers pre-recorded audio-visual materials via its newsletter and website was sufficient to survive a motion to dismiss). (Opp'n at 7:4–12, 7:17–19.)

These last cases come closest to suggesting that Defendant is a "video tape service provider." The news sites, WebMD, and Defendant operate webpages. The webpages host pre-recorded video content. Some of this video content is embedded into the webpage, rather than physically delivered, bought, or sold. *See, e.g.*, *Ambrose*, 2022 WL 4329373, at *1. Still, in important ways, the allegations made in each case support the inference that news agencies and WebMD are "significantly tailored" to deliver audio visual material in ways Plaintiff has not alleged here. *Compare* FAC ¶ 14 ("Specifically, Defendants' business model involves monetizing instances in which consumers watch videos."); *with Ambrose*, 2022 WL 4329373, at *1 (alleging *The Boston Globe* "creates, hosts, and disseminates hundreds, if not thousands, of videos for various purposes" (internal quotation marks omitted)), *and Czarnionka*, 2022 WL 17069810, at *4 (alleging *The Epoch Times* disseminates videos spanning "news programs, television shows, documentaries, movies, and other audiovisual content"), *and Lebakken*, 2022 WL 16716151, at *1 (alleging Lebakken "provided her email address to WebMD to receive an e-newsletter, which frequently contained video content"). Such allegations plausibly suggest that the

defendants in each above case have "significantly tailored" their business to video delivery. There are no similar allegations in this case.

Accordingly, the Court finds Plaintiff has failed to state a claim on the basis that he has not properly alleged that Defendant is a "video tape service provider." Therefore, it **GRANTS** Defendant's Motion to the extent it seeks dismissal pursuant to Rule 12(b)(6). Such dismissal is without prejudice. *See Tosco Corp. v. Cmtys. for a Better Env't*, 236 F.3d 495, 502 (9th Cir. 2001). If Plaintiff is able to do so, he may amend his Complaint to include further allegations supporting an inference that Defendant's business model is "significantly tailored" to the delivery of video content, rather than "peripherally" or "passively" involved in such an exercise. *See In re Vizio*, 238 F. Supp. 3d at 1204. And because the Court finds that Plaintiff has not sufficiently pleaded the first element of his claim, it withholds judgment on the remaining elements.

## IV.   CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Dismiss Plaintiff's Complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. (ECF. No. 10.) However, it **GRANTS** Defendant's Motion to dismiss for failure to state a claim under Rule (12)(b)(6). Such dismissal is **WITHOUT PREJUDICE** to Plaintiff filing an amended pleading that resolves the deficiencies identified by this order. If Plaintiff wishes to do so, he must file a Second Amended Complaint by **July 24, 2023.**

**IT IS SO ORDERED.**

**DATED: July 10, 2023**

Hon. Cynthia Bashant
United States District Judge